**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARK V. ANGEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:11cv0092 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Mark V. Angel (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a brief in support of his complaint; the Acting Commissioner has filed a brief in support of her answer.

**Procedural History**

Plaintiff applied for DIB in March 2010, alleging he became disabled the month before by scoliosis, degenerative disc disease, status-post two knee surgeries, and right hip

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant.  See 42 U.S.C. § 405(g).

pain. (R.[2] at 100-01.)  His application was denied initially and after a hearing held in March

2010 before Administrative Law Judge (ALJ) Robert M. McPhail.  (Id. at 6-19, 23-45, 50-

53.)  The Appeals Council denied Plaintiff's request for review, thereby effectively adopting

the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Thomas W. King, a certified vocational

rehabilitation counselor, testified at the administrative hearing.

Plaintiff testified that he is married and lives in a house with his wife.  (Id. at 27, 28.)

He has two children, a son age seventeen years and a daughter age eight.  (Id. at 27.)  He

graduated from high school and has one year of college.  (Id.)  He is 5 feet 6.5 inches tall and

weighs 192 pounds.  (Id. at 28.)  He has a driver's license, and, although he can drive, he has

difficulty sometimes driving.  (Id. at 27.)  He has not worked since his disability onset date.

(Id. at 28.)

Asked to explain the difficulties he is having that preclude work, Plaintiff explained

that his right knee "gives out," requiring that he wear a brace.  (Id. at 28-29.)  The knee

buckles, constantly hurts, and occasionally swells.  (Id. at 29.)  He can walk no farther than

one and one-half blocks.  (Id.)  In a month, he has no more than ten "normal" days and

approximately fifteen "really bad day[s]."   (Id.)  To try to alleviate the pain, Plaintiff sits,

puts a pillow under the knee, applies a heat pad, and takes medication.  (Id. at 30.)  His low

---

[2]References to "R." are to the administrative record filed by the Acting Commissioner with
her answer.

back constantly hurts, making it difficult on some days for him to get out of bed.  (Id.)  His doctors do not know what to do about the pain.  (Id. at 31.)  They are trying to treat it with medication and avoid surgery.  (Id.)  Lying still and applying heat helps lessen the pain.  (Id.)  Some of his medications make him groggy; some make his sleep restless.  (Id.)  His back pain radiates to his legs, sometimes making his left foot go numb for up to two hours.  (Id. at 32.)  His neck pain does not radiate.  (Id.)

Plaintiff sleeps for four or five hours a night, usually going to bed around two or three o'clock in the morning and getting up around eight.  (Id. at 33.)  He then takes a shower, tries to vacuum "a little bit," and sits down.  (Id.)  He cannot stand for longer than fifteen to twenty minutes.  (Id.)  His son does the yard work.  (Id. at 34.)  He can no longer enjoy his former hobby of working on cars.  (Id.)  The heaviest weight he can lift is fifteen pounds, if he is using both hands.  (Id.)  On an average day, the heaviest weight he can lift is five to ten pounds.  (Id. at 35.)  He can sit for no longer than thirty minutes, and this is if he is constantly shifting his weight.  (Id.)  On a scale from one to ten, his pain averages a six.  (Id.)  Because of his difficulties bending, he has problems putting on his socks and shoes.  (Id. at 36.)

After he inquired about the exertional requirements of Plaintiff's past relevant work, Mr. King, testifying without objection as a vocational expert (VE), was asked to assume a hypothetical individual with Plaintiff's age, education, and work experience and with the capacity to lift ten pounds frequently and twenty pounds occasionally, to stand for up to two hours, and to occasionally climb, balance, stoop, kneel, crouch, crawl, and bend.  (Id. at 37-

39.)  This person can not work around ropes, scaffolds, or ladders and has to avoid concentrated exposure to hazards.  (Id. at 39.)  The VE testified that the ALJ was correct in assuming that this hypothetical person can not perform Plaintiff's past relevant work.  (Id.) This person can, however, perform jobs there are light,[3] unskilled work.  (Id. at 40.)  For instance, he can perform such jobs as mail clerk, office helper, and small products assembler. (Id.)  If the person needs to alternate between sitting and standing every twenty to twenty-five minutes, none of these jobs will be eliminated.  (Id. at 41.)  If, however, the person can only attend and concentrate for two-thirds of the day, all of these jobs will be eliminated.  (Id.) Nor will there be any other jobs that such a hypothetical person can perform if he is absent from work for more than two days a month.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, an assessment of his physical functional capacities, and a rating decision by the Department of Veterans Affairs (VA).

When applying for DIB, Plaintiff's attorney completed a Disability Report on his behalf.  (Id. at 113-23.)  Plaintiff's ability to work was limited by mild scoliosis, degenerative disc disease, two right knee surgeries, right hip pain, bulging discs, lumbar spine pain, and curvature of the spine.  (Id. at 114.)  His height was 5 feet 6 inches; his weight was 190

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

pounds.  (Id.)  Because of his condition, he stopped working on February 23, 2010.  (Id. at 115.)  He had completed high school and one year of college.  (Id.)  He had not been in special education classes.  (Id.)  He had also completed law enforcement and firefighter training.  (Id.)

Plaintiff completed a Function Report.  (Id. at 136-43.)  Asked to describe what he did from when he awoke until he went to bed at night, he reported that, after showering and getting dressed (with help), he ate breakfast, washed some dishes, tidied the house (as tolerable), rested, ate lunch, helped fix supper, helped children with homework and baths, watched television, and went to bed.  (Id. at 136.)  He has trouble sleeping due to the pain.  (Id. at 137.)  Before his illnesses, he hiked, worked on cars, swam, fished, and worked as a public safety officer.  (Id.)  Now, he did none of these.  (Id.)  Also, he no longer cooks meals as often as he did before.  (Id. at 138.)  Because of the difficulties he has standing, he now only cooks a simple meal twice a week.  (Id.)  He does not do any yard work due to back and knee problems.  (Id. at 139.)  It is hard for him to sit or stand for a long time.  (Id. at 141.)  His impairments adversely affect his abilities to lift, squat, bend, reach, walk, sit, kneel, and climb stairs.  (Id. at 141.)  Plaintiff did not circle "stand" as one of the abilities his impairments adversely affect.  (Id.)  The farthest he can walk is one and one-half blocks before having to rest for five minutes.  (Id.)  He can pay attention for approximately fifteen minutes.  (Id.)  He can follow written and spoken instructions well.  (Id.)  Because of his concern about being able to do his job safely and to defend himself, he had to quit his job as a public safety officer.  (Id. at 142, 143.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his application. (Id. at 150-54, 156-62.) There had been no change in his impairments since he had completed the initial report. (Id. at 150, 156.)

An earnings report generated for Plaintiff reflected consistent earnings from 1990 to 2009. (Id. at 106-07, 109.) In the last six years included, his annual earnings ranged from a low of $27,317[4] in 2007 to a high of $32,251 in 2009. (Id. at 107, 109.)

The relevant medical records[5] before the ALJ are summarized below in chronological order and begin in 2008 when Plaintiff consulted N. Eugene Thomas, D.O., on October 30 about acute knee strain. (Id. at 199-200.) Plaintiff was given a note releasing him from work from October 31 to November 8. (Id.)

In June 2009, Plaintiff was seen at the Audrain Medical Center emergency room. (Id. at 209-18.) He reported that the right side of his neck had felt sore after being in a motor vehicle accident the day before and was feeling more sore that day. (Id.) X-rays of his cervical spine showed no fracture or dislocation. (Id. at 218.) Plaintiff was diagnosed with neck sprain and discharged with instructions to take Tylenol or Motrin as needed. (Id. at 212.)

In October, x-rays of Plaintiff's right hip taken at the VA Clinic were normal. (Id. at 258.)

_____

[4]The amounts have been rounded to the nearest dollar.

[5]Medical records focusing on unrelated impairments, e.g., Plaintiff's liver problems, are not summarized.

In November, Plaintiff consulted Michael Quinlan, M.D., a physician practicing with Dr. Thomas, about a cough and body aches preceded by chills.  (Id. at 198.)  On examination, his extremities were not swollen and his motor strength was normal.  (Id.)  He was diagnosed with viral gastroenteritis and chronic back pain, given a prescription for Darvocet,[6] and advised to use it sparingly.  (Id.)

The following month, Plaintiff complained to Dr. Quinlan of right knee pain that was an eight on a ten-point scale.  (Id. at 197.)  It was noted that the VA would be taking care of Plaintiff's joint problems.  (Id.)  X-rays taken of Plaintiff's knees at the Audrain Medical Center revealed a normal right knee and, with exception of chondrocalcinosis,[7] a normal left knee.  (Id. at 206.)

A few days later, Plaintiff was seen at the VA Clinic for complaints of low back pain and right hip and knee pain.  (Id. at 234-36, 319-26.)  Plaintiff described the pain as constant and radiating to his right leg without any numbness or tingling.  (Id. at 234.)  The pain was partially relieved by heat and medication.  (Id.)  Every one to two months, Plaintiff had moderate flare-ups of his hip pain that lasted three to seven days.  (Id. at 321.)  During these flare-ups, "his mobility [was] severely limited."  (Id.)  Plaintiff also had flare-ups of his right knee pain.  (Id. at 322-23.)  These were moderate in severity, weekly in frequency, and one to two days in duration.  (Id.)  Time, rest, and pain medications provided the only relief of

---

[6]Darvocet is a combination of propoxyphene, a narcotic pain reliever, and acetaminophen. Drugs.com, Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited March 12, 2013).  It was withdrawn from the United States market in November 2010.  Id.

[7]Chondrocalcinosis is "[c]alcification of cartilage."  Stedman's Medical Dictionary, 331 (26th ed. 1995) (Stedman's)..

any of the flare-ups.  (<u>Id.</u> at 321, 323)  On examination, Plaintiff had a normal range of motion in his spine and knees, with the exception of being mildly limited in the flexion of both knees.  (<u>Id.</u> at 236.)  He walked with a limp.  (<u>Id.</u>)  The diagnosis was low back pain with radiculopathy and right hip and knee pain.  (<u>Id.</u>)  He was to continue taking his medications as needed.  (<u>Id.</u>)  The notes of his examination include a comment that he was "unable to perform sedentary employment activities as he is unable to sit or stand for more than a few minutes at a time and now requires a locking knee brace."  (<u>Id.</u> at 319-20.)

The following week, a screening for depression and post-traumatic stress disorder were both negative.  (<u>Id.</u> at 239, 240.)  It was noted that Plaintiff had missed ten weeks from work during the past twelve months because of his knee and back pain.  (<u>Id.</u> at 244.)  The pain had caused difficulties with reading, problems with lifting and carrying, and decreased concentration, stamina, and mobility.  (<u>Id.</u>)  Also, the pain prevented him from engaging in sports and had a moderate affect on his abilities to do chores, shop, exercise, travel, drive, and engage in recreational activities.  (<u>Id.</u> at 244-45.)  It was noted that one of his medications, Soma, caused sleepiness and grogginess.  (<u>Id.</u> at 245.)  His symptoms included fatigue, stiffness, weakness, pain, and a decrease in his range of motion.  (<u>Id.</u> at 246.)  He was having flare-ups of his spinal pain two or three times a week, each lasting for one to two days.  (<u>Id.</u>)  During a flare-up, he was unable to do anything but his necessary daily activities. (<u>Id.</u> at 247.)  He does not go to the emergency room or see his doctor during a flare-up; instead, he takes medication, uses a heat pad, and lies flat.  (<u>Id.</u>)

- 8 -

X-rays taken in January 2010 of Plaintiff's right knee showed a "slight medial joint space narrowing" and "a few very tiny poorly demonstrated calcifications," but the knee was otherwise normal for a man of Plaintiff's age.  (Id. at 256-57, 276-77, 327.)  X-rays of his lumbosacral spine revealed some disc space narrowing at the L5-S1 level.  (Id. at 257-58, 341-42.)

In February, a magnetic resonance imaging (MRI) of Plaintiff's lumbar spine revealed some degenerative changes at the L5-S1 level; a minimal, if any, disc bulge at L3-L4 and at L4-L5; and some dessiccation of the disc at L5-S1.  (Id. at 255-56, 339-41, 339-40, 360-61.) (Id. at 255-56.)  The impression was of a disc bulge mainly at the L5-S1 level with mild to moderate narrowing of the neuroforamina bilaterally.  (Id. at 256.)  A few days later, Plaintiff was seen by Dr. Quinlan for a follow-up for his low back pain and right hip and knee pain. (Id. at 230-32.)  He was given a note releasing him from work for the next month.  (Id. at 232.)

Plaintiff was seen again at the VA Clinic on March 3 for back pain.  (Id. at 229-30.) The pain was still present, but had improved since he had been off work.  (Id. at 229.)  He had a normal range of motion in his spine and walked with a limp.  (Id. at 230.)  His prescriptions for Darvocet and Soma were renewed, and he was advised to keep his appointment with Physical Medicine and Rehabilitation (PM&R).  (Id.)

Nine days later, Plaintiff dropped into the Clinic to obtain a transcutaneous electrical nerve stimulation (TENS) unit for low back pain and for treatment of his right knee and back pain.  (Id. at 224-29.)  He reported that he had first had knee surgery in 1992 and then again

in 2008 for repair of a meniscus tear.  (Id. at 225.)  His back pain had started in 1995-1996.

(Id.)  His back used to hurt three to four times a week, but was now constant and was

aggravated by bending and twisting.  (Id.)  The pain was a constant ache with an occasional

stabbing feeling.  (Id.)  The pain was usually a four and, at its worst, a nine.  (Id.)  His

medications, Darvocet and Soma, took "the edge off" the pain.  (Id.)  He had had four

injections, the last being in 2001, and none had given him relief lasting longer than one week.

(Id.)  On examination, Plaintiff's right knee was stiff, but not was limited in its range of

motion.  (Id.)  The pain was currently a two and had been a six at its worst during the past

week.  (Id.)  The pain was aggravated by walking and alleviated by heat and by being

elevated by a pillow under the knee.  (Id.)  He had had two surgeries, but no physical therapy.

(Id.)  He sometimes needed help with dressing, but was otherwise independent in his

activities of daily living.  (Id. at 226.)  He had occasional neck pain accompanied by a loss

of range of motion.  (Id. at 227.)  He had a full range of motion and normal muscle strength

in his lower extremities.  (Id. at 228.)  His gait was antalgic on the right.  (Id.)  He could not

heel and toe walk without difficulty.  (Id.)  Phalen's test was negative,[8] but extension caused

him localized back pain.  (Id.)  He was diagnosed with knee and back pain, the latter possibly

being caused by his abnormal gait.  (Id. at 229.)  He was to wear a TENS unit and a knee

brace and return in two months.  (Id.)

---

[8]"The Phalen's Sign test is performed by resting the patient's elbows on a flat surface with the elbows bent and the forearms up, flexing the wrists and allowing them to hand for 60 seconds.  If pain, numbness, or tingling in the fingers is felt during this time, then it is possible the patient has carpal tunnel."  **Edwards v. Astrue**, 2012 WL 5383204, *3 n.1 (W.D. Ark. 2012) (citation omitted).

A March 22 notation in Dr. Quinlan's records reflects that Plaintiff had contacted the office to request a letter saying that he was no longer able to work as a policeman or fireman and that Dr. Quinlan, who had last seen Plaintiff in November 2009, had replied that the request should be directed to the VA.  (Id. at 223.)

Plaintiff returned to the VA Clinic on May 17 for a follow-up visit for his back and knee pain, reporting that the brace had made his knee pain tolerable but his back pain "ha[d] been really bad."  (Id. at 267-69, 367-69.)  His pain that day was a five to six; his pain the day before was a nine.  (Id. at 368.)  The TENS unit helped, as did tramadol if the pain was not too bad.  (Id. at 267.)  He was weaning off the Darvocet and taking it only once  a day. (Id.)  On examination, Plaintiff had a full range of motion in his lower extremities, an asymmetrical gait when wearing the brace on his right knee, a negative Phalen's test, and a negative straight leg raising test to 80 degrees.[9]  (Id. at 268.)  He was tender at the lumbar paraspinal muscles at L3, L4, and L5.  (Id.)  He was going to try taking Trazodone for sleep. (Id. at 269.)  He was applying for Social Security disability as the job of first responder "ha[d] gotten to be too much."  (Id. at 268.)

One week later, Plaintiff was seen again at the VA Clinic.  (Id. at 270-86, 326-38, 345-60, 361-67, 370-72.)  Plaintiff reported that he had begun experiencing sharp and dull pain in his right hip in approximately 2004 that was associated with his back and right knee

---

[9]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

pain.  (Id. at 270.)  X-rays for osteoarthritis were negative, but the pain persisted.  (Id.)

During the past few months, he had begun to have pain in his left hip and knee similar to that

in his right hip.  (Id.)  He now could only hobble.  (Id.)  The pain in his hips had decreased

his range of motion, was of moderate severity, and occurred every one to two months, lasting

for three to seven days each time.  (Id. at 271.)  His right knee pain was severe every two to

three weeks and lasted for three to seven days.  (Id. at 272.)  It locked several times a week

and was unstable.  (Id.)  Because of the effects of this knee pain, Plaintiff had to stay home.

(Id.)  Plaintiff's left knee pain was moderate in severity, happened weekly, and each episode

lasted for one to two days.  (Id.)  Plaintiff reported that his low back pain had also increased

over the past few months and that he was beginning to experience numbness in the lateral

side of his left foot.  (Id. at 279.)  The back pain "manifest[ed] [itself] with popping of the

spine and muscular spasms strong enough to make him breath [sic] shallowly."  (Id.)

Because of the back pain, he no longer slept well.  (Id.)  Consequently, he had to stop

working in law enforcement.  (Id.)  There were no signs of malingering.  (Id. at 359.)  X-rays

of both hips and of his thoracic spine were normal.  (Id. at 276, 285, 326, 338-39, 351-52,

370-72.)  Plaintiff was diagnosed with degenerative joint disease of both knees, status-post

surgery on his right knee and popliteal mass on his left, bilateral trochanteric bursitis,

degenerative disc disease of his thoracolumbar spine with radiculopathy to his left lower

extremity, and chronic thoracic strain.  (Id. at 277-78, 286, 328, 331.)  The affect of these

impairments on his daily activities varied from preventing such activities, e.g., shopping,

exercising, and playing sports, to a severe affect on other activities, e.g., engaging in

recreational activities, to a moderate affect on some activities, e.g. being able to travel and bathe, to a mild or no affect.  (Id. at 277-78, 286, 329.)  He could walk no farther than one block.  (Id. at 335.)  The examining physician, James Richard Marzolf,[10] described Plaintiff's activity level as being "extremely diminished."  (Id. at 367.)  His "gait and posture are so extreme as to afford a very abnormal pattern of biomechanical strain on his musculoskeletal system."  (Id.)  Also, the pattern he adopted to minimize his lumbar pain caused a constant kyphotic[11] pressure on his thoracic spine.  (Id.)

On June 1, Plaintiff was at the VA Clinic for a follow-up on his liver function tests, see note 5, supra, and for his back pain.  (Id. at 343-45.)  He reported that he continued to have back pain; however, it was less since he had quit his police job and had been off work.  (Id. at 343.)  On examination, he had bilateral negative straight leg raises, normal muscle tone and strength in his upper and lower extremities, and a normal range of motion in his spine.  (Id. at 345.)  He wore a right knee brace and walked with a limp.  (Id.)  He was to follow up in one year, or sooner if necessary.  (Id.)

Plaintiff was seen at Dr. Quinlan's practice on July 6 for complaints of congestion and possible bronchitis.  (Id. at 287-88.)  The pain in his back and right knee was a seven out of ten.  (Id. at 287.)  Plaintiff was described as being  "well nourished, well developed . . . male in no apparent distress."  (Id.)  He was diagnosed with acute bronchitis and sinusitis with a

---

[10]There is no indication whether Dr. Marzolf is an M.D. or D.O.

[11]Kyphotic relates to kyphosis, "[a] deformity of the spine characterized by extensive flexion." Stedman's at 925.

cough.  (Id.)  Two weeks later, Plaintiff was treated at the VA Clinic for bronchitis.  (Id. at 304-16, 370.)  An x-ray of his heart and lungs was normal.  (Id. at 315-16, 370.)

In August, Plaintiff was seen at the VA Clinic for a follow-up for his back and knee pain.  (Id. at 301-03.)  His pain was currently an eight and was lessened, but not relieved, by Darvocet.  (Id. at 301-02.)  On examination, Plaintiff's right thigh had a slight disuse atrophy.  (Id. at 302.)  There was no swelling.  (Id.)  He had a full range of motion in his lower extremities and an antalgic gait on the right knee.  (Id. at 302-03.)  He was given a Synvisc[12] injection in the right knee and a prescription for Tylenol #3 "for breakthrough pain."  (Id. at 303.)

On November 3, Plaintiff's only complaint was of a dull headache for the past two weeks.  (Id. at 298-300.)  He was prescribed ibuprofen to be taken as needed.  (Id. at 300.)

On November 23, Plaintiff was at the VA Clinic for a follow-up visit for his knee and back pain.  (Id. at 294-98.)  Plaintiff reported that his pain had "slightly improved" with Tylenol #3.  (Id. at 295.)  His knee pain was usually greater than his back pain and was currently a six.  (Id.)  He was continuing to wear his right knee brace and use the TENS unit.  (Id.)  The August injection had provided mild pain relief for two to three weeks.  (Id.)  His medications, including the Tylenol #3 and tramadol, were providing some benefit.  (Id.)  He was continuing to complain of insomnia in spite of taking Trazodone.  (Id. at 296.)  There were no changes in his ability to walk; his gait was smooth and symmetric with a slowed

---

[12]"Synvisc [is] an injectable medication called hyaluronan."  Jonathan Cluett, M.D., Synvisc, http://orthopedics.about.com/cs/treatment/a/synvisc.htm (last visited March 12, 2013).  Hyaluronan is a lubricating fluid and "has also been shown to have anti-inflammatory properties."  Id.

cadence.  (Id.)  He had a full range of motion in his lower extremities.  (Id. at 297.)  A lumbar Phalen's test was negative.  (Id.)  He was tender over the lumbar interspinous ligament at L4-5.  (Id.)  He was to continue with his home exercise program, advised to stay active, and asked to return in six months.  (Id.)  His back and knee pain were diagnosed as stable.  (Id.)  His dosage of Trazodone was doubled.  (Id.)

Plaintiff was seen again in December at the VA Clinic for persistent shortness of breath, cough, wheezing, and congestion for five to six days.  (Id. at 292-94.)  It was noted that he had a history of bronchitis/pneumonia in the winter and was using his inhalers regularly.  (Id. at 292.)  He was described as being in no pain and as being able to walk without difficulty.  (Id. at 294.)  He was diagnosed with asthmatic bronchitis, prescribed a Z pack, and told to continue using his inhalers.  (Id.)

In February 2011, when visiting the VA Clinic about his liver problems, Plaintiff was reportedly not in any pain and was walking without any difficulty.  (Id. at 289-91.)

Also before the ALJ was an assessment of his physical residual functional capacity and the VA's decision on Plaintiff's disability claims.

In April 2010, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Monica Bax, a single decision-maker.[13]  (Id. at 261-66.)  The primary diagnosis was degenerative disc disease in his lumbar spine; the secondary diagnosis

---

[13]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

was left knee chondrocalcinosis.  (Id. at 261.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day. (Id. at 262.)  Plaintiff had postural limitations of only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, or scaffolds.  (Id. at 263.)  He had no manipulative, visual, or communicative limitations.  (Id. at 263-64.)  He had postural limitations of needing to avoid concentrated exposure to vibration and hazards. (Id. at 264.)

The VA issued its rating decision on Plaintiff's claims in March 2011.  (Id. at 178-94.) The VA held, in relevant part, that Plaintiff (1) was entitled to individual unemployability effective March 2010; (2) had a ten percent disability caused by his left lower extremity radiculopathy; (3) had a ten percent disability related to his status-post arthroscopy, plica excision, of his right knee; (4) had a forty percent disability related to his degenerative disc disease of his lumbar spine and chronic thoracic strain; (5) had a ten percent disability caused by trochanteric bursitis in his left hip; (6) had a ten percent disability caused his degenerative joint disease in his left knee; and (7) had a ten percent disability caused by degenerative joint disease in his right hip.  (Id. at 178-79.)

### The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2013, and had not engaged in substantial gainful activity since his alleged onset date of February 23, 2010.  (Id. at 11.)  The ALJ next found that Plaintiff had

- 16 -

severe impairments of degenerative disc disease, degenerative joint disease of the right knee and right hip, scoliosis, and neck pain.  (Id.)  Plaintiff did not, however, have an impairment or combination of impairments that met or medically equaled one of listing-level severity, including Listings 1.02 and 1.04.  (Id. at 11-12.)  Specifically, although he wore a right knee brace and occasionally walked with a cane, there was no indication that he was unable to ambulate effectively as required for Listing 1.02.  (Id. at 13.)  Nor was there any evidence of a compromised nerve root or of any of the other spinal impairments required for Listing 1.04.  (Id. at 14.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that he could perform light work with the capacity to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk for two hours in an eight-hour work day, sit for six hours, and alternate at will between sitting and standing during the eight-hour work day.  (Id.)  Also, Plaintiff was to avoid climbing ladders, ropes, and scaffolds, although he could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps.  (Id.)  He was to avoid concentrated exposure to hazards.  (Id.)

In reaching his RFC finding, the ALJ considered Plaintiff's allegations about the extent of the affect of his impairments on his ability to function and found them not to be fully credible.  (Id. at 15-17.)  The ALJ found that Plaintiff's decision to wait until he is older to undergo back surgery and his activities of daily living, e.g., his shopping for groceries once a week for thirty minutes, suggested that his limitations were not as severe as alleged.  (Id.

- 17 -

at 16.)  The ALJ further found that the VA's rating decision was not binding because the VA applied different rules and regulations than governed Title II proceedings.  (<u>Id.</u>)

With his RFC, Plaintiff was, however, unable to perform his past relevant work.  (<u>Id.</u> at 17.)  With his education, age, work experience, and RFC, Plaintiff could perform other jobs existing in significant numbers in the national economy.  (<u>Id.</u>)  He was not, therefore, disabled within the meaning of the Act.  (<u>Id.</u> at 18.)

### <u>Legal Standards</u>

Under the Act, the Commissioner shall find a person disabled if the claimant "is unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

- 18 -

First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must have a severe impairment.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(ii).  A severe  impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iii) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **<u>Warren v. Shalala</u>**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **<u>Moore</u>**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **<u>Ingram v. Chater</u>**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[A] claimant's RFC [is] based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  **<u>Moore</u>**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887).

- 19 -

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"  **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'"  **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(a)(4)(iv).  The burden at step four remains with the claimant.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to his past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ is to find the claimant to be disabled.  See 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)).  When reviewing the record, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'"  **Id.** (quoting Medhaug, 578

- 21 -

F.3d at 813).  "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"  **Id.** (quoting Medhaug, 578 F.3d at 897).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) failing to properly consider the opinions of his VA physicians and (2) not properly evaluating his credibility.

The ALJ cited Ms. Bax's PRFCA findings and, noting that she was a single decision-maker, did not give her assessment any evidentiary weight.  The ALJ also noted the recent progress notes of the VA Clinic referring to Plaintiff having a normal range of motion, no difficulty walking, and no pain.  These notes were made in the context of Plaintiff seeking treatment for ailments unrelated to his alleged disabling impairments, i.e., bronchitis and liver problems.  The ALJ did not cite the findings of the VA physicians who treated Plaintiff for back and knee pain and reported functional limitations, including that he was incapable of performing any sedentary work.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord

- 22 -

**Anderson v. Astrue**, 696 F.3d 790, 793 (8th Cir. 2012); **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011).  "'However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  **Anderson**, 696 F.3d at 793 (quoting Wildman, 596 F.3d at 964 (8th Cir.2010)) (alteration in original).  "Ultimately, the ALJ must 'give good reasons' to explain the weight given the treating physician's opinion."  **Id.** (quoting 20 C.F.R. § 404.1527(c)(2)).

There might be such good reasons in the instant case.  As noted by the Acting Commissioner in her brief, straight leg raises, see note 9, supra, were negative and the results of x-rays and MRIs consistently failed to reveal objective findings supportive of the debilitating effects described by Plaintiff.  As noted by Plaintiff in his brief, however, the records of his visits for back and knee pain include assessments of the affects of that pain on his activities of daily living and his functional capabilities that do support his description of the intensity of his symptoms.

It is undisputed that, when evaluating a treating physician's opinion, "the [ALJ] must evaluate the record as a whole," **Wagner**, 499 F.3d at 849, and "'may credit other medical evaluations over that of the treating physician when such assessments are supported by better or more thorough medical evidence,'" **id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000)).  In the instant case, the ALJ credited references in notes of clinic visits for conditions not at issue over references in notes of visits for pain that is at issue.  The former

- 23 -

include references to Plaintiff walking without difficulty, although it is undisputed that he wears a brace on his right knee.[14]  The latter detail the effect of Plaintiff's pain on a variety of functions, including dressing, traveling, shopping, and bathing, and include an opinion that Plaintiff could not sit or stand long enough to perform sedentary work.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009), or when it consists of conclusory statements, **Wildman**, 596 F.3d at 964. See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").  The opinions about Plaintiff's functional capacities are neither inconsistent nor conclusory.[15]  Although there might be good reasons for discrediting these opinions, the decision of the ALJ fails to give any such reasons, nor can any be implied in light of the ALJ's sparse explanation of his conclusions.  Consequently, the case shall be remanded for the ALJ to more completely explain his reasoning for his apparent rejection of the opinions of the VA physicians who treated Plaintiff for his back and knee pain.

---

[14]The Court notes that the question whether Plaintiff can ambulate effectively as defined in Listing 1.02 is not interchangeable with the weight to be given observations in his medical records that he ambulated with an antalgic gait or with difficulty.

[15]The opinions might, however, depend on Plaintiff's credibility, which is discussed below.

The ALJ also rejected as not completely credible Plaintiff's description of the far-reaching limiting affect of his pain on his functional capacities.  He cited two reasons for his rejection:  (1) Plaintiff's decision to defer back surgery until he is older and (2) Plaintiff's daily activities, including "maintain[ing] his personal grooming and hygiene with assistance in aspects related to his lower extremities such as dressing and bathing"; "prepar[ing] simple meals and perform[ing] household chores such as vacuuming with breaks if needed"; and "shop[ping] for groceries once a week for about thirty minutes to an hour."  (R. at 16.)

As noted above, when evaluating a claimant's credibility, the ALJ must consider the relevant factors:  "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner**, 646 F.3d at 558.  "If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'"  **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2008)); accord **Buckner**, 646 F.3d at 558.  Additionally, although "ALJs "must acknowledge and consider [the] . . . [relevant] factors before discounting a claimant's subjective complaints, . . . ALJs 'need not explicitly discuss each . . . factor.'"  **Wildman**, 596 F.3d at 968 (quoting Goff, 421 F.3d at 791); accord **Buckner**, 646 F.3d at 559; **Lowe v. Apfel**, 226 F.3d 969, 971-72 (8th Cir. 2000).

Consideration of the relevant factors both supports and detracts from Plaintiff's credibility.  For instance, Plaintiff has a good work history, but his alleged disability onset date is not related to any aggravating factor or event.  See **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (claimant's work history is a consideration in evaluating a claimant's credibility); **Nunn v. Heckler**, 732 F.2d 645, 648 (8th Cir. 1984) ("[A] claimant with a good record is entitled to substantial credibility when claiming an inability to work because of a disability.") (internal quotations omitted).  The x-rays and MRIs do not support his allegations, but the medical records reflect contemporaneous complaints of pain and functional limitations that do support those allegations.  Cf. **Teague**, 638 F.3d at 615 ("Given that none of [the claimant's] doctors reported functional or work related limitations due to her headaches, there was a basis to question [the claimant's credibility].").  Although he wants to wait until he is older to have back surgery – a detracting factor, he also takes strong pain medication and uses a TENS unit – a supporting factor.  See **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir. 1998) (claimant's numerous visits to doctors, injections, and use of TENS unit, among other treatment modalities, supported her allegations of disabling pain).

The factor that upsets this balance between detracting and supporting considerations is the weight given by the ALJ to Plaintiff's daily activities as detracting from his credibility. Those daily activities include performing personal grooming and hygiene tasks "with assistance in aspects related to his lower extremities such as dressing and bathing"; preparing a simple meal twice a week, doing household chores with breaks, and shopping for groceries once a week for no longer than one hour.  "Although [a]cts which are inconsistent with a

- 26 -

claimant's assertion of disability reflect negatively upon that claimant's credibility, [the Eighth Circuit Court of Appeals] has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." **Reed v. Barnhart**, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotations omitted) (alteration in original). In **Kelley**, 133 F.3d at 588-89, a claimant's testimony that she could take care of her daily needs but required help with housework and shopping supported her credibility. In **Swope v. Barnhart**, 436 F.3d 1023, 1024, 1026 n.4 (8th Cir. 2006), a claimant's daily activities of doing dishes, shopping, carrying groceries into the house, driving a car, mowing the lawn, and fishing were held not to be a reason for discrediting his complaints of disabling pain. Cf. **Buckner**, 646 F.3d at 558 (claimant's daily activities of caring for son and frequently-ill girlfriend, housecleaning, doing some yard work, occasionally playing sports, and socializing and playing games with friends or family members detracted from credibility); **Halverson v. Astrue**, 600 F.3d 922, 928 (8th Cir. 2010) (claimant's activities of traveling, visiting friends, shopping, and caring for her activities of daily living detracted from credibility).

The brevity of the ALJ's credibility analysis precludes a meaningful review by the Court of that analysis. See **Willcockson v. Astrue**, 540 F.3d 878, 880 -81(8th Cir. 2008) (remanding case for reevaluation of claimant's credibility when some of reasons given by ALJ were refuted by record and others required clarification); **Muncy v. Apfel**, 247 F.3d 728, 735-36 (8th Cir. 2001) (remanding case for reconsideration of claimant's credibility when ALJ's reliance on lack of supporting objective medical evidence was apparently refuted by record).

- 27 -

Consequently, the case shall be remanded for an analysis of Plaintiff's credibility in accordance with the relevant factors. This remand shall not be construed as a finding in favor of or adverse to Plaintiff's credibility.

## Conclusion

For the foregoing reasons, the case shall be reversed and remanded for the ALJ to explain his reasoning for his apparent rejection of the opinions of the VA physicians who treated Plaintiff for his back and knee pain and for a more-detailed assessment of Plaintiff's credibility. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further, limited proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.



/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of March, 2013.